The last case on for argument is Hathaway v. Colvin. Mr. Schneider, good morning. Good morning. I'm Mark Schneider. I'm representing Bobby Gene Hathaway in this Social Security appeal. And this is a very different situation than most of the Social Security appeals that you hear or that I come to this court with because my client was receiving benefits. As of 2006, she was receiving Social Security disability because she had back problems, had had failed back surgery. She had a traumatic brain injury that was causing seizures and memory loss and other problems. So in this case, it's the commissioner that has the burden to prove by substantial evidence two things. One, that the conditions have improved. But number two, also, the commissioner has to prove that she's now able to perform work on a full-time, sustained basis. And in this case, the commissioner did not meet that burden. And I have a question, though. And that is, her initial disability rating in 1996 was under listing 12.05C for intellectual capacity and seizure disorder. But when we get to 2011, 2012, both sides seem to be talking about her back problems. Yes. And I know you raised this, that this wasn't really a reconsideration of her initial determination, that is, the mental health issues and the seizure. But why was there such a focus on the back problems in 2012 when that wasn't the basis of her initial 96, 2001, 2006 determinations? It was a basis of the 2006 determination that she had her back surgery after she had the traumatic brain injury. And she transferred, and I'm not sure all the procedural reasons, from SSI to Social Security. And that was the region. The brain injury was separate. That was in 95, I think. That's right. That's right. So we have to look. In 2012, the standard that we're looking at is not just the brain injury, it's the brain and the back. And even in 1995, I believe, she had an IQ test that showed she had a full-scale IQ of 70, which is borderline mentally retarded. But her memory then was less than 50. Her performance IQ was 68. Visual memory, 63. And even in 2012, she had continued headaches and memory problems, which were acknowledged by the commissioner's own consultant, Dr. Miller, opine that she had problems with attention concentration and memory and that these would likely interfere with her ability to maintain a regular schedule because of her memory deficits. And Dr. Miller, the commissioner's own examining consultant, recommended a further exam regarding her cognitive problems, which are caused by her traumatic brain injury. And he even concluded that she would need assistance to manage her own finances when he examined her. Now, in addition, before the hearing in 2012, her treating physician, primary care doctor, Dr. North, determined that she was permanently disabled by her clinically determined back pain, and this was supported by an MRI. There was a second MRI that showed some stabilization in one of her, I believe, L5-S1. But at L4-L5, there was a herniation that was infringing on the fecal sac, which certainly is enough objective evidence to support her pain. And the ALJ did not develop the record. He did not order a consultative cognitive exam recommended by his own consultant. And he did not ask Dr. Gon, her neurologist, or Dr. North for more evidence about her pain. Rather, he didn't credit her. We have an EMG taken just two months after the ALJ hearing that corroborated that she had a radiculopathy or a nerve impingement that would cause the pain. Let me get back to my question. This is a different kind of case where she was initially determined to be disabled. Yes. But now you're still talking about her disc problem in her back. That wasn't the basis for her disability in 1996, 2001, or 2006, right? It was in 2006. In 2006, the ALJ correctly found the line from which you would have to have improvement included her failed back syndrome. He had to determine whether she was now improved enough from both her cognitive and physical impairments to be able to work in 2012. And that's one prong of why I think the commissioner didn't meet their burden. And then, of course, we have the fact that we fast forward to 2015, and it turns out the reason she couldn't walk, the reason she couldn't stand, that she had severe pain that an earlier examiner found was not credible, because she had severe bilateral peripheral vascular disease, and that disease causes pain in the legs, inability to walk, and trembling in her hands and numbness. And this is new in material evidence that is retroactive or retrospective to before 2012. She had been complaining. Do we have to consider that evidence in order to come out the way you want us to? No. No, I think we have enough just based on the record that the commissioner did not meet the burden that she had improved enough to be able to work. And we also have to look at her obesity and other problems. But with her cognitive problems, the ALJ did not consider those. He found that she could do light work even though she had testified and Dr. North said she can't, she's limited in walking and standing, and he found she could do light work. There is not. So we can set aside the issue, and I understand what you're saying. We can, but I think if you don't find that's enough, that the new evidence clearly supports her credibility and why she had so many problems walking. And the physician's assistant who misdiagnosed her, who said, oh, she has no neurological problems that would cause this, they didn't realize that she had peripheral vascular disease. Can I just go back to the mental problems for a second? Sure. The ALJ did make a finding. The severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.02, which is probably the wrong listing. And it may not meet the listing, but you still consider that as a non-exertional limitation, and you would need a vocational expert to say a person who doesn't have the memory to regularly have a regular schedule, can they do any job in the economy? And I think the answer is no. I will sit down and be back in a moment. Would you preserve three minutes for rebuttal, Mr. Schneider? Ms. Fishman? Good morning, Your Honors. May it please the Court. The podium goes down a little bit. If you reach over to your right, there's a button on top. There you go. If you would like that, and I don't. Right. You're okay. I'm okay. In this continuing disability review case, substantial evidence. How's that? Thank you. Substantial evidence supports the Commissioner's decision that Ms. Hathaway's condition improved such that she was able to perform a range of unskilled light work during the relevant period from January 10th, 2012, when SSA found she was no longer disabled, through November 1st of 2013, the date of the ALJ's decision. The ALJ relied here on the opinions of Dr. Blaber, the state agency medical consultant, which was consistent with the exertional requirements of light work. The ALJ properly considered medical evidence related to Ms. Hathaway's seizure disorders, which was, in fact, a basis for a previous allowance when she was found to meet the listing for epilepsy and found that her seizures had been brought under control with medication during the relevant period. With regard to her back impairment. Before you leave what I'll call the mental neurological issues, your adversary suggests that there was some evidence of memory loss or memory function and that the examination of the job listings didn't accommodate that. Well, certainly with regard to the mental impairments, the ALJ properly considered opinion evidence from Dr. Miller, the consultative examiner, and Dr. Hoffman, the state agency consultant, both of whom generally offered opinions that Ms. Hathaway could perform the basic mental requirements of unskilled work. In fact, Dr. Miller stated that Ms. Hathaway's psychiatric impairments were not significant enough to interfere with her functioning on a daily basis. We have a case, VINO, that says for us to make this determination, whether she's made this improvement enough to remove her from disability payments, we have to look at her situation now and also her medical situation and psychiatric condition when she was granted disability. So that means we're supposed to look at the records from 1996, 2001, and 2006, and so was the ALJ, the hearing officer, and the district court. Were those documents ever produced to anybody to make that comparison? If she's better now, what was the problem other than her IQ? The only thing I saw was the IQ number, but I didn't see any records from those determinations. Were they ever presented? They do not appear in the administrative record here. We do have summaries from the hearing officer and from Dr. Hoffman that summarized what was going on there with the previous IQ scores. It is apparent that they contributed to a previous allowance. I think what's significant here, Your Honor, is that we see Ms. Hathaway's mental functioning during the relevant period. In fact, she was able to work as a teacher. What about the penal cases? We've got to make a comparison here. And in the findings of fact by the hearing officer, he said we couldn't find her folder from 1996. 2001 was just continued on collateral estoppel, which means because she got it before, we're giving it to her again. We don't have those records. In 2006, there's no records either that anybody points to, right? They're summaries, but they're kind of out of the blue summaries, aren't they? It is true, Your Honor. There do appear to be some missing records here. I will point out that Ms. Hathaway's counsel did not raise that as a specific argument in the brief. Here? I saw Vino was cited by him in his brief here, right? Am I wrong about that? I believe the case was cited but not specifically for the argument that the fact that the previous records were there had been a lost folder at some point I do not believe was raised as a specific grounds for remand. In this case. Vino says, thus, in order to determine whether medical improvement has occurred, the SSA must compare the current medical severity of the impairment, the medical severity of that impairment at the time. This is page 25 and 26. Isn't that raised enough, especially when you cite Vino? In a general sense. But I think what's critical here is that we remain with a substantial evidence standard here, and substantial evidence supports the ALJ's decision that Ms. Hathaway was able to function and perform unskilled work during the relevant period here. She has, in fact, at the hearing testified that her back impairment was the thing that was keeping her from working. She didn't deny that she had been able to work as a teacher's aide, notwithstanding whatever mental limitations she may have experienced. She didn't allege that that was an issue that ever stopped her from working. With regard to memory deficit, she actually stated at the hearing that it's not that bad. We see Dr. Hoffman and Dr. Miller, who examined her. Dr. Miller, as I mentioned, stating that her mental impairments were not significant enough to interfere with her daily functioning. Dr. Hoffman, who reviewed the full record, generally indicated she could perform the mental requirements of unskilled work. Does it make any difference which of the two standards you used, 12.02 for organic mental disorders or 12.05 here C, intellectual disability, which 12.05 C was the basis for 96, right? But it seems like everybody was following 12.02 until the district court saw that. Does it make any difference? Either way, substantial evidence supports the decision that Ms. Hathaway could perform the mental requirements of unskilled work. Under 12.02, which we would argue was the correct listing under which to analyze the traumatic brain injury under the regulations, Ms. Hathaway did not meet the paragraph B criteria in terms of her daily activities, her social functioning, her ability to sustain concentration. Many of those same factors actually translate over into the adaptive functioning requirements to meet listing 12.05. Adaptive functioning speaks to a person's ability to engage in day-to-day activities, interact socially, sustain a job, and the ALJ's decision speaks to all of that. So even without mentioning 12.05 explicitly, I think the ALJ's decision really makes abundantly clear why Ms. Hathaway would not meet the requirements of 12.05. And moving on again to her physical limitations, Ms. Hathaway brings up the diagnosis of peripheral vascular disease, which was diagnosed almost a full two years after the relevant period ended in August of 2015. Ms. Hathaway's argument essentially is that this subsequent diagnosis retrospectively shows that Ms. Hathaway did not actually improve during the relevant period, which ended approximately two years earlier. The remand is not warranted here for further consideration of that subsequent diagnosis. Because? In part because there is no evidence showing that that diagnosis dated as far back as the relevant period. No doctor who diagnosed it ever stated that it dated that far back. And even if the condition had begun to manifest in small ways during the relevant period, the record shows a subsequent deterioration of that condition, such that the medical records and the diagnosis from after the relevant period cannot speak to Ms. Hathaway's condition during the relevant period. We really see very different clinical findings. She could introduce that as evidence in a new application to cover the period. She certainly can. She has, in fact, filed a subsequent application with an alleged onset date a few days after the date of the ALJ's decision. It was denied at the initial level, but it's pending now in a hearing before another ALJ, and so she will certainly have the opportunity to introduce that evidence at another time. Okay. So with all of that substantial evidence supports the commissioner's decision that medical improvement occurred during the relevant period, and Ms. Hathaway was able to perform substantial gainful activity during that time. Thank you. Thank you, Ms. Fishman. And Mr. Schneider, you've reserved three minutes for rebuttal. Yes, thank you. Most of the doctors cited by the commissioner to support their case are non-examining consultants. They get essentially no weight when you look at examining doctors or treating doctors. There is an issue of whether my client continued to have petit mal seizures or not at the time of the hearing. She seemed to be referring to grand mal when she said she had stopped falling down and having bad seizures, but she did testify she continued to have seizures, and the ALJ should have consulted with her treating neurologist about that. And her memory problems, which are well documented by the IQ test and by Dr. Miller's own observations, will affect her credibility. The judge discredited her for some minor inconsistencies in her testimony. So I think the ALJ, there was not substantial evidence, if we look at everything, to even discredit her. But she was testifying as of 2011-2012 that she could only stand or walk for a few minutes. She was using a cane. She said it was prescribed. And Dr. North supported that testimony, found that she couldn't do the sitting or standing. They did not attribute it to the vascular disease. But later on, when treating the vascular disease, Dr. Papps, the surgeon, noted she'd been having these problems for six years. The ALJ noted that she could do some activities of daily living, but if you listened to and read her testimony, she needed help from her husband. She did try working in 2005. The record shows she worked in 2005, and she worked, I think, at page 137. $592 in 2006. But at that point, she was found also to be disabled by her back condition, and it's uncontested that she was unable to do any work after 2006. I urge the Court to find that the commissioner did not meet her burden, but if you find that somehow the commissioner met the burden to show my client could work, then we have to look at the new evidence. It bolsters her credibility. It gives an objective basis for her conditions. And so I think there's enough evidence here to remand for payment because the commissioner did not meet her burden. But if you don't find that, I would ask that you remand for consideration of the bilateral vascular disease. Thank you. Thank you. Thank you, Mr. Schneider. Thank you both. We'll reserve decision. The remaining two cases, United States v. Rivera and Wade v. Nassau County, are on submission. So I will ask the clerk please to adjourn court.